Bankers Conseco Life Ins. Co. v Wilmington Trust, N.A. (2021 NY Slip Op 02355)





Bankers Conseco Life Ins. Co. v Wilmington Trust, N.A.


2021 NY Slip Op 02355


Decided on April 20, 2021


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: April 20, 2021
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Barbara R. Kapnick
Troy K. Webber Angela M. Mazzarelli Jeffrey K. Oing


Index No. 652057/19 Appeal No. 13185 Case No. 2020-02386 2020-03521 

[*1]Bankers Conseco Life Insurance Company, et al., Plaintiffs-Appellants,
v
Wilmington Trust, National Association, Defendant-Respondent.



Plaintiffs appeal from the order, Supreme Court, New York County (O. Peter Sherwood, J.), entered on or about March 25, 2020, which, insofar as appealed from as limited by the briefs, granted defendant Wilmington Trust, National Association's motion to dismiss the first and second causes of action for breach of contract and breach of fiduciary duty to the extent they concern assets that are not freely negotiable. Plaintiffs also appeal from the order, same court and Justice, entered August 18, 2020, which, insofar as appealable, denied plaintiffs' motion for relief from the dismissal of the first cause of action based on newly discovered evidence of defendants' gross negligence.




Sills Cummis & Gross, P.C., New York (Joseph L. Buckley, Richard H. Epstein, Matthew L. Lippert and Laura E. Sedlak of counsel), for appellants.
Hodgson Russ LLP, Buffalo(Spencer L. Durland, Daniel C. Oliverio, Robert J. Lane, Jr. and Pauline T. Muto of counsel), for respondent.



Mazzarelli, J. 


Plaintiffs are issuers of long-term care insurance policies. They entered into reinsurance agreements with non-party Beechwood Re Ltd pursuant to which plaintiffs transferred over $550 million into four reinsurance trusts to be managed and invested by Beechwood and its affiliated agent, B Asset Manager. The insurance regulations promulgated by the states in which each of the plaintiffs are licensed and domiciled required the parties to retain a trustee to administer the trusts, and plaintiffs and Beechwood retained defendant Wilmington Trust, National Association for that purpose. Wilmington's role was largely ministerial, and included such duties as accepting assets and crediting them to the trust accounts, keeping records and issuing activity reports, and collecting and depositing interest and dividends. The trust agreements expressly stated that Wilmington was not responsible for determining whether assets were "eligible" for placement in the trusts, as that term was defined in the agreements. However, the agreements did provide that Wilmington was not to accept into the trusts any "non-negotiable" assets, meaning assets that were not capable of being liquidated at a moment's notice without the need to clear any administrative hurdles. Further, the agreements provided that Wilmington would "only be liable for its own negligence, willful misconduct, or lack of good faith in connection with its performance" and that "in no event shall [Wilmington] be liable under or in connection with this . . . Trust Agreement for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever."
Beechwood turned out to be an alter ego of Platinum Partners LP, a hedge fund that concocted a scheme to defraud insurance companies by agreeing to act as a reinsurer and then unlawfully siphoning off money from the assets it consequently gained access to. Rather than conservatively investing the insurers' assets, as the reinsurance agreements contemplated, [*2]Beechwood made risky investments in distressed businesses and its own affiliated entities. In September 2016, plaintiffs received directives from regulatory bodies declaring that a substantial portion of the trust assets were not in compliance with state law and effectively requiring plaintiffs to terminate the reinsurance agreements and recapture business ceded to Beechwood in order to avoid disciplinary action.
Plaintiffs allege in this action that during the term of the trust agreements Wilmington accepted into the trusts at least 33 assets that were not freely negotiable. In addition, the complaint alleges that Wilmington knew that B Asset Manager directed the trusts to invest in high-risk investments that were noncompliant with the trust agreements and took no action to stop these investments or warn plaintiffs. As relevant to this appeal, the operative amended complaint asserts a first cause of action for breach of contract and a second cause of action for breach of fiduciary duty, alleging that Wilmington abdicated its contractual role as gatekeeper and breached its fiduciary duty as trustee by allowing large numbers of nonnegotiable assets into the trusts. Plaintiffs allege that they were directly damaged by Wilmington's omissions insofar as they suffered diminutions in the value of those assets because they were not freely negotiable; were forced to pay third parties to obtain the consent that Wilmington promised it would secure prior to accepting the assets into the trusts; and were forced to incur professional fees paid to untangle the assets.
Wilmington moved to dismiss the complaint, arguing that under the relevant agreements, it was hired to perform only the ministerial functions (mainly bookkeeping and reporting) associated with the trust accounts, and had no obligation or duty to warn plaintiffs about, or prevent, Beechwood's improper investments. While conceding that the trust agreements are ambiguous as to whether Wilmington had a gatekeeper obligation to ensure that Beechwood did not seek to place nonnegotiable assets in the trusts, Wilmington argued that any claim for breach of this obligation nevertheless fails as a matter of law, because the alleged damages were not direct, but rather consequential, and thus barred by the trust agreements. Wilmington further argued that the agreements disclaim extra-contractual duties, and so there is no fiduciary duty between the parties that could serve as the basis for a claim for breach of fiduciary duty.
In their opposition papers, plaintiffs argued that their damages were direct because they were the "natural and probable consequence of the breach." They further argued that as a trustee Wilmington had fiduciary obligations to them that were extra-contractual, and that Wilmington's alleged breach of those duties were not duplicative of the allegations that they breached the contract. Supreme Court granted defendants' motion to dismiss plaintiffs' complaint. As is relevant here, the court [*3]found that all of the damages sought by plaintiffs were attenuated from the breach, such that they were barred by the provision prohibiting recovery for consequential damages. As to the breach of the fiduciary duty claim, the court dismissed it as duplicative of the breach of contract claim, rejecting plaintiff's contention that the fiduciary duty arose from extra-contractual circumstances, and finding that the allegations supporting this cause of action concerned defendant's alleged breach of the same contractual provisions that were the basis for the breach of contract causes of action.
Plaintiffs argue on appeal that if, as Wilmington effectively concedes, the allegations in the complaint sufficiently allege that its actions amounted to a breach of the trust agreements, then it cannot be the case that no direct damages flow from that breach. At the very least, it contends, it is premature on a pre-answer motion to dismiss for any court determine which damages are direct and which are not. Moreover, they claim, any argument that plaintiffs cannot recover for Wilmington's failure to perform would render toothless the contractual provision holding it liable for its own negligence, a provision which was specifically required by state regulations.
In any event, plaintiffs claim that the diminution in value it attributes to the nonnegotiable status of the assets is a direct result of the breach. They analogize to Latham Land I, LLC v TGI Friday's, Inc. (96 AD3d 1327 [3d Dept 2012]), where the defendant breached a lease provision requiring it to build a restaurant on the land leased to it by the plaintiff. The plaintiff sought the difference between the value of the land had the improvements been made, and the actual price it was able to sell the property for without the improvement. The defendant argued that such a measure of damages was consequential in nature, and barred by a provision in the operative contract similar to the one here. The Court found for the plaintiff, stating that "the loss asserted here is the very essence of the contract between the parties — i.e., the diminution in value of the actual property defendant promised to improve and lease" (96 AD3d at 1332). Plaintiffs argue that Wilmington's obligation to prevent the inclusion in the trusts of non-negotiable assets was similarly the "very essence of the" trust agreements and that, since negotiable assets are worth more than nonnegotiable assets, it is entitled to recover the difference between the two. Plaintiffs urge us to reject the motion court's conclusion that any direct harm to them was caused by Beechwood's actions in placing the nonnegotiable assets in the trusts, while Wilmington's failure to prevent Beechwood from doing so was an attenuated consequence of Beechwood's actions. They further contend that Wilmington's argument that plaintiff's direct damages amount only to the fees Wilmington was paid is disingenuous, since Beechwood paid those fees, not plaintiffs. Finally[*4], plaintiffs posit that any expenditures they had to make to clear improper encumbrances on the assets, as well as concomitant professional fees, were sufficiently proximate to Wilmington's wrongdoing to constitute direct damages.
In arguing that plaintiffs suffered no direct damages based on diminution in value of the assets based on their nonnegotiability, Wilmington argues that plaintiffs did not own the assets, but rather had a secured interest in them, and thus cannot claim the loss in value as inuring to them. Defendants further question the notion that ensuring the value of the assets represented any part of the bargain between plaintiffs and Wilmington, analogizing this action to such cases as DirecTV Latin Am., LLC v RCTV Intl. Corp. (115 AD3d 539 [1st Dept 2014]). There, this Court found that the defendant-counterclaimant, a television broadcaster, suffered no direct damages when the plaintiff, which had agreed to distribute the broadcaster's programming, stopped doing so. That was because the alleged damages of "the loss of the 'general market value of having a television channel reach a [larger] viewing audience'" (id. at 541), were wholly based on lost advertising revenue, which itself was an attenuated consequence of the breach, and not a direct result of it. Wilmington emphasizes the difference between the value of a service, such as acting as gatekeeper for a reinsurance trust, and the value the service "unlocks," which is ensuring that the assets have the value the insurer expects them to have. Thus, defendants distinguish Latham Land I, on the basis that the value of the service the lessee promised, improving the property with a restaurant, was inextricable from the value that was unlocked, the concomitant increase in the property value.
Wilmington also points us to Vitol Trading S.A., Inc. v SGS Control Servs., Inc. (874 F2d 76 [2d Cir 1989]). There, the court held that the defendant, a company that tested the composition of a substance that resulted from the distillation of crude oil, was not liable to the plaintiff, a seller of the substance, when it was forced to renegotiate the price of a shipment to a buyer. The court found that the plaintiff could not establish causation, because, even though the defendant's methodology was apparently faulty, even an accurate measure would have shown that the substance did not conform to the contract between the plaintiff and the buyer. In what it acknowledged was dicta, the court also held that, in any event, the measure of damages would have been limited to the nominal fee the defendant was paid. This was because there was no evidence that the defendant had notice that it could be held to account if a faulty test resulted in the buyer's refusal to pay the contract price to the plaintiff.
We agree with plaintiffs that the breach of contract claim was prematurely dismissed. As stated by the court in Vitol Trading "[consequential] damages . . . arise from the unique circumstances of the [*5]case" (874 F2d at 79). In other words, there is no standard test for determining what are direct damages and what are not, and each case must be analyzed in in accordance with its particular facts. In Latham Land I, it was clear what the plaintiff's direct damages were, since it bargained with the defendant for improvements to its property and did not receive them. In DirecTV Latin Am., it was equally clear that there was no inherent value in plaintiff-counterclaim defendant's agreement to carry the defendant-counterclaimant's signal on its television network that was not ultimately tied to lost profits, which is the classic example of consequential damages. In Vitol Trading, the court observed that the defendant testing company was hired to perform "a zero-sum analysis. Thus, [it] had absolutely no notice that if it erred in its determination of the magnitude of non-conformance that it would be held liable for over one-half million dollars in damages" (874 F2d at 82).
This case falls somewhere between Latham Land I, on the one hand, and DirecTV Latin Am., LLC and Vitol Trading on the other. It has similarities to Latham Land I insofar as it can be argued that, in light of Wilmington's promise not to accept nonnegotiable assets into the trusts, and to be responsible for its own negligence, maintaining the value of the assets in the trusts was inherent in the service Wilmington agreed to provide. Thus, there is merit to plaintiffs' argument that when the assets proved not to be negotiable, they lost the benefit of their bargain and were entitled to recover as direct damages the diminution in value, and the concomitant costs of restoring the assets to negotiable status, such as professional fees. That plaintiffs did not merely have a secured interest in the assets, since ownership would revert to them upon recapture, buttresses plaintiffs' claim that they are entitled to the difference in value. To be sure, this case also echoes DirecTV Latin Am., LLC and Vitol Trading since Wilmington was hired to perform a discrete task and any damages that exceed the value to plaintiffs of the task itself (i.e., the fee) could be characterized as indirect.
Ultimately, however, we agree with plaintiffs that, at this stage of the litigation, it is difficult to discern whether the parties contemplated that Wilmington would have to pay the damages sought by plaintiffs if it failed to perform under the trust agreements. Again, the agreements provided that Wilmington would be liable for "its own negligence," which a reasonable factfinder could consider as recognition that Wilmington, if it did not perform its duties in accordance with a minimum level of care, would need to pay more than the nominal damages represented by its fee. It is simply unclear under the case law whether the trust agreements bar plaintiffs from recovering damages based on the fact that Wilmington's negligence in allowing the placement of nonnegotiable assets in the trusts resulted in the trusts [*6]containing assets, beneficially owned by plaintiffs, that were lower in value than they would have been had Wilmington performed its duties. In the absence of clear precedent supporting Wilmington's position that the only conceivable direct damages against a sophisticated trustee who negligently performs gatekeeping duties are measured entirely based on the fees paid to the trustee, a trier of fact must resolve the ambiguity as to what constitutes recoverable direct damages versus unrecoverable consequential damages in a damages limitation provision where, as here, a gatekeeper negligently fails to perform. Thus, the breach of contract claim should not have been dismissed prior to fact and expert discovery on this point.
We reject Wilmington's argument that, even without the damages limitation provision, the breach of contract claim should be dismissed because plaintiffs are barred from recovering from Wilmington the "diminution of value of the non-negotiable Trust assets," pursuant to Section 4.8(b) of the trust agreements. That provision states that Wilmington "shall not be responsible" for the value of trust assets. Wilmington contends that the language in that clause preserving liability for its negligence relates solely to the "validity, perfection, priority or enforceability" of liens, subjects not at issue here. However, plaintiffs correctly argue that the relevant language applies to the "existence, genuineness or value of any of the Assets." Thus, properly read, this provision provides a basis for finding that Wilmington is responsible for the "value" of the nonnegotiable assets to the extent the value of those assets was impaired by Wilmington's negligence, bad faith, or willful misconduct in failing to review the transaction documents or failing to prevent nonnegotiable assets from being deposited into the trusts, as long as that is not overridden by the consequential damages limitation provision.
We also find that the court erred in dismissing the claim for breach of Wilmington's fiduciary duty concerning assets not freely negotiable. Wilmington was designated as a trustee, which at the very least raises a question whether it owed fiduciary duties to plaintiffs as beneficiaries of the trusts that were separate from the trustee's contractual duties under sections 2.1(b) and 4.2(c) of the trust agreements. In the absence of a specific, express disclaimer, Wilmington, as trustee, owed either genuine fiduciary duties or, at a minimum, an extra-contractual duty of care to the trust beneficiaries. Even though the breach of contract and breach of fiduciary duty claims involved the same conduct, the fiduciary duty claim alleges a breach of a noncontractual duty relating to the trustee's independent duty to perform nondiscretionary ministerial duties with respect to the negotiability of assets. Thus, the fact that Wilmington's failure to prevent nonnegotiable assets from entering the trusts breached both fiduciary and contractual duties does [*7]not bar plaintiffs from seeking damages related to the former (see 37 E. 50th St. Corp. v Restaurant Group Mgt. Servs., L.L.C., 156 AD3d 569, 571 [1st Dept 2017]).
Accordingly, the order of the Supreme Court, New York County (O. Peter Sherwood, J.), entered on or about March 25, 2020, which, insofar as appealed from as limited by the briefs, granted defendant Wilmington Trust, National Association's motion to dismiss the first and second causes of action for breach of contract and breach of fiduciary duty to the extent they concern assets that are not freely negotiable, should be reversed, on the law, without costs, and the causes of action reinstated. The appeal from the order, same court and Justice, entered August 18, 2020, which, insofar as appealable, denied plaintiffs' motion for relief from the dismissal of the first cause of action based on newly discovered evidence of defendants' gross negligence, should be dismissed, without costs, as academic in light of our reversal of the March 25, 2020 order.
Order Supreme Court, New York County (O. Peter Sherwood, J.), entered on or about March 25, 2020, which, insofar as appealed from as limited by the briefs, reversed, on the law, without costs, and the causes of action reinstated. Appeal from the order, same court and Justice, entered August 18, 2020, dismissed, without costs, as academic in light of our reversal of the March 25, 2020 order.
Opinion by Mazzarelli, J. All concur.
Kapnick, J.P., Webber, Mazzarelli, Oing, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: April 20, 2021